# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

RACEL D'ANGELO,          )
                                    )
      Plaintiff,        )
                                    )
     vs.                )     **Case number 4:09cv0386 TCM**
                                    )
MICHAEL J. ASTRUE,     )
Commissioner of Social Security,  )
                                    )
      Defendant.    )

## MEMORANDUM AND ORDER

This 42 U.S.C. § 405(g) action for judicial review of the final decision of Michael J. Astrue, the Commissioner of Social Security ("Commissioner"), denying Racel D'Angelo's applications for disability insurance benefits ("DIB") under Title II of the Social Security Act ("the Act"), 42 U.S.C. § 401-433, and supplemental security income benefits ("SSI") under Title XVI of the Act, 42 U.S.C. § 1381-1383b, is before the Court, see 28 U.S.C. § 636(c), for a final disposition. Ms. Angelo has filed a brief in support of her complaint; the Commissioner has filed a brief in support of his answer.

## Procedural History

Racel D'Angelo ("Plaintiff") applied for DIB and SSI on May 18, 2006, alleging she became disabled two days earlier as a result of bipolar disorder and depression. (R.[1] at 121-

---

[1]References to "R." are to the administrative record filed by the Commissioner with his answer.

31.)  Her applications[2] were denied initially and after a hearing in May 2008 before Administrative Law Judge ("ALJ") Robert E. Ritter.  (Id. at 5-84.)  The Appeals Council denied Plaintiff's request for review, effectively adopting the ALJ's decision as the final decision of the Commissioner.  (Id. at 1-3.)

## Testimony Before the ALJ

Plaintiff, represented by counsel; Morris Alex, M.D.; and Delores E. Gonzalez, M.Ed. testified at the administrative hearing.

Plaintiff testified that she was born on October 25, 1970, and was then 37 years old. (Id. at 28.)  She is 5 feet tall and weighs 190 pounds, having gained approximately 70 pounds in the past two years due to a sedentary life style caused by an injury to her left ankle.  (Id.) She did not finish high school, but did obtain a General Equivalency Degree ("GED").  (Id. at 29.)  Plaintiff is divorced and shares joint custody of her son with his father, with whom her son lives.  (Id. at 29, 44-45.)  She sees her son every other weekend.  (Id. at 45.)  She lives in a mobile home she shared with her mother until her mother died.  (Id. at 40.)

Plaintiff last worked as a presser, both machine and hand, at a dry cleaner.  (Id. at 29, 30.)  This job required that she lift up to 25 pounds and be on her feet all day.  (Id. at 29.) She had also worked for Daimler-Chrysler on the assembly line.  (Id. at 30.)  This job required that she lift up to 50 pounds and be on her feet up to 10 hours a day.  (Id.)

---

[2]Plaintiff had applied for DIB in January 2004 and again in July 2005, each time alleging a disability onset date of August 2003, but had not pursued the applications beyond the initial denial. (Id. at 139.)

Plaintiff injured her ankle in November 2005 when she fell off a four-wheeler. (Id. at 31.) After her initial, open reduction surgery, she had to have another surgery in October 2006. (Id. at 31.) The most recent doctor she has seen about her ankle, Dr. Klein,[3] has told her that is nothing further that can be done and that Plaintiff just had to live with the pain. (Id. at 32.) The pain is constant, but varies in intensity. (Id.) It is worse when she is standing and, sometimes, when she gets up from a sitting position. (Id. at 33.) The pain will ease up when she starts walking. (Id.) She wears an ankle brace and takes anti-inflammatory medications to relieve the pain. (Id.) She also began having problems with her right knee when her left ankle was in a cast and she started putting more weight on the knee. (Id. at 33, 34.) Her doctor is going to start giving her injections for the knee pain. (Id. at 34.) The pain comes and goes, but the inflammation stays. (Id.)

Plaintiff further testified that she has a bipolar disorder and has been seeing a psychiatrist since 1997. (Id. at 35.) She has been seeing her current psychiatrist, Dr. Stromsdorfer, every three to five weeks since 2004. (Id. at 35, 50.) She does not see a counselor. (Id. at 49-50.) She constantly has problems with depression and crying spells. (Id. at 36.) It is very difficult for her to concentrate, remember things, and complete tasks. (Id. at 36, 37.) She is nervous around people and is not sociable. (Id. at 37.) She does not visit anyone outside her home, including friends or relatives, but her daughter, brother, and "guy friend" will come and check up on her. (Id. at 39-40.) Later in the hearing, she testified that she and her friend will sometimes go to a movie or out to dinner. (Id. at 45.) She is not

_____

[3]The name is misspelled in the hearing transcript as "Kline."

active in any church or other organization.  (<u>Id.</u> at 40.)  She does not handle stress well and becomes anxious in tense situations, e.g., the hearing.  (<u>Id.</u> at 37-38.)  She has anxious feelings every day and night.  (<u>Id.</u> at 55-56.)

Plaintiff also has a history of cocaine use.  (<u>Id.</u> at 35.)  Until the year of the hearing, 2008, she had not used cocaine since January 2005.  (<u>Id.</u>)  She did not know what had caused the relapse.  (<u>Id.</u> at 35-36.)  She is again on the "straight and narrow."  (<u>Id.</u> at 36.)

Plaintiff has difficulty sleeping and is up several times during the night.  (<u>Id.</u> at 37, 54-55.)  Because of this, she has no regular time that she gets up in the morning.  (<u>Id.</u> at 41.)  Once she does get up, she tends to her dogs, cooks something to eat, watches television, and makes some telephone calls.  (<u>Id.</u> at 42.)

Plaintiff drives two or three times a week, usually to the grocery store a mile away.  (<u>Id.</u> at 38.)  She is in the store for no longer than five to ten minutes.  (<u>Id.</u> at 52.)  Because of her ankle and her lack of fitness, she can walk no farther than a quarter mile before having to stop and rest.  (<u>Id.</u> at 38, 53.)  Her pain before stopping would be a ten.  (<u>Id.</u> at 53.)  Because of her back pain, she can not be on her feet for longer than seven to ten minutes before having to sit and rest.  (<u>Id.</u> at 38-39, 51, 52.)  During the day, Plaintiff is on her feet for an aggregate amount no longer than two to three hours.  (<u>Id.</u> at 51.)  She does not have any difficulty sitting.  (<u>Id.</u> at 39.)  Later in the hearing, Plaintiff testified that she was having pain in her left ankle and right knee when sitting there and attributed it to the weather.  (<u>Id.</u> at 46.)  The pain was a seven and a-half on a ten-point scale, with ten being the worst.  (<u>Id.</u>)  Because of her right knee, she does have difficulty climbing stairs, bending, and stooping.  (<u>Id.</u> at 39.)  The

heaviest weight she can lift and carry is seven to ten pounds.  (Id.)  She testified she does not know if she can lift anything heavier.  (Id.)  She was going to start treatment for her right knee in two weeks.  (Id. at 56.)

Asked if she has problems with personal grooming, e.g., bathing or dressing, Plaintiff replied that she sometimes lacks the motivation to accomplish those tasks.  (Id.)  Her daughter helps her with the yard work and housework and her brother helps her with her bills.  (Id. at 41.)

Plaintiff no longer enjoys her former hobby of fishing.  (Id. at 40.)  She lacks the desire to do anything.  (Id.)

Plaintiff's medications have side effects of blurred vision, sore throat, acne, migraines, and frequent urination.  (Id. at 42.)  She has a headache or migraine every day.  (Id. at 43.)  She takes Topamax for the migraines; it helps "some."  (Id.)  With her previously-prescribed medication, she could not go through a day without having to lie down.  (Id.)  With the Topamax, she can.  (Id.)  She takes only anti-inflammatories.  (Id. at 46.)  Dr. Stromsdorfer refuses to prescribe any medication with a controlled substance because of her history of drug abuse.  (Id. at 44.)

Asked if she could have performed any work after May 2006, Plaintiff explained that she could not because she was in a cast until the previous July.  (Id. at 47.)  Asked if she could perform a sit-down job, Plaintiff replied that she had never done such work and she was not "a social type of person as far as a secretarial type."  (Id. at 48.)  Asked if she could perform an assembly job, she answered that she "guess[ed] [she] could have tried."  (Id.)

Asked if there had been any improvement in her mental condition since her alleged disability onset date, Plaintiff testified that it was difficult to say because of the death of her mother and the loss of custody of her son. (Id. at 49.)

Plaintiff's psychiatrist does not think she would be able to handle working. (Id. at 50.) She thinks the stress of a job, including that of an assembler, would be too much for her. (Id. at 51.)

Dr. Alex asked Plaintiff about a notation in a February 2008 medical record that she had had a magnetic reasonance imaging ("MRI") of her brain. (Id. at 57.) At first she did not remember it, but later recalled that it was done to rule out blood clots when she was having migraines. (Id. at 57, 59.) The lesion shown turned out to be scar tissue. (Id. at 60.) She also testified that Dr. Stromsdorfer told her she did not have to go to the Bridgeway Program[4] – she wanted to be home for her son's birthday – on the condition that she agree to submit to drug testing at any time. (Id.) Asked about a reference in the records to her having stopped her psychotropic medications in 2004, Plaintiff first explained that she had taken them to the hospital and the hospital had lost them and then, after the relevant dates were clarified, stated she could not remember that far back. (Id. at 61-62.)

Asked by the ALJ if, based on the record, he could offer a medically certain diagnosis of Plaintiff's condition, Dr. Alex replied that he could and the diagnosis was as follows.

---

[4]See page 26, infra.

History of increased blood pressure. . . . [N]ow on page 5 of Kreider,[5] 4/24/08, says chronic obstructive pulmonary disease. There's no pulmonary function tests to evaluate. Obesity, with her high weight, she has a BMI of 38 which is at level 2 of obesity. . . . Since 12/03 there's notations of alcohol abuse, and cocaine, and pot abuse. The last episode was . . . on 2/14/08 when she was at St. John's. That was her last episode when she was on cocaine use. There's repeated notes in the file that she's been a drug seeker from multiple MDs and the pharmacies over the years, and [Plaintiff] has stated that she is drug-free now. . . . She, indeed, had a left lateral maliglar [phonetic] fracture and was operated on. She was told to be non-weight bearing, but the notes on . . . 12/2/05 states not compliant and has been walking on the leg. Then 12/30 says weight-bearing, and says she's working . . .

. . .

The last report is from Dr. Kline,[6] . . . . It indicates . . . they felt that there was no further – that the joint was stable and there shouldn't be – she still has some loose screws, but they did feel it warranted any surgery. It should not be removed. And it states – the only notations about her walking is on the second page, states she's walking with a relatively normal gait and has a very mild limp. There was no swelling of her left ankle and there's no evidence of any limitations placed on her in terms of that ankle, so that it would appear she was capable of walking. . . . So, from the record, she – 1.02(a) she does not meet.

(Id. at 64-65.) (Only [phonetic] alteration added.) Addressing the issue of Plaintiff's bipolar disorder, Dr. Alex noted the three Global Assessment of Functioning[7] ("GAF") scores, 60,[8]

---

[5]"Kreider" refers to Crider Health Center. See pages 27 and 28, infra.

[6]See note 3, supra.

[7]"According to the *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Text Revision 2000), the Global Assessment of Functioning Scale is used to report 'the clinician's judgment of the individual's overall level of functioning.'" **Hudson v. Barnhart**, 345 F.3d 661, 663 n.2 (8th Cir. 2003); accord **Juszczyk v. Astrue**, 542 F.3d 626, 628 n.2 (8th Cir. 2008).

[8]A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." Diagnostic Manual at 34.

65,[9] and 80,[10] and the inconsistency between the doctor's "return to work" remark in March 2005 and his later conclusions on one part of a form that Plaintiff could work and on another that she could not.  (Id. at 66.)  Dr. Alex later reiterated that he could not explain the inconsistencies in the psychiatrist's remarks.  (Id. at 67.)

The ALJ left the record open for thirty days to give Plaintiff's counsel the opportunity to obtain and submit an explanation from her psychiatrist for the inconsistencies.[11]  (Id. at 68.)

Ms. Gonzales was the next, and last, witness to testify.

The ALJ asked her to assume the following hypothetical person.

[Plaintiff] is limited to light-type work activity, can lift 20 pounds occasional [sic], 10 pounds frequent [sic], can be on her feet for up to two hours in an eight-hour workday at intervals of no more than . . . ten minutes at a time . . . .

But can be on her feet up to two hours in an eight-hour period, can't climb ladders, ropes, or scaffolding, can sit with normal breaks throughout an eight-hour workday, should not engage in work that requires her to squat.  From the environmental standpoint, she should avoid work where her body would be jolted and vibrated violently . . . or operating heavy equipment where she would be shaken and jolted in the seat.  Let's also have her avoid work where she's concentratedly [phonetic] exposed to cold temperatures.

(Id. at 70-71.) (Only [phonetic] alteration in original.)

---

[9]A GAF score between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  Diagnostic Manual at 34.

[10]A GAF between 71 and 80 is described as "[i]f symptoms are present, they are transient and expectable reactions to psycho-social stressors . . . ; no more than slight impairment in social, occupational, or school functioning . . . ."  Diagnostic Manual at 34.

[11]See page 37, infra.

The VE testified that Plaintiff could not return to her past relevant work, but could work as a stuffer, table worker, addresser, small products assembler, or surveillance system monitor. (Id. at 71-72.) These jobs existed in significant numbers in the state and national economies. (Id.) She would also be able to perform some cashier jobs and some jobs at a fast food restaurant, which also existed in significant numbers in the state and national economies. (Id. at 73.) If, however, Plaintiff was also unable to perform complex or detailed work activity and had to avoid the general public and co-workers, she could not work in a fast food restaurant or be a cashier. (Id. at 74.) If Plaintiff had the restrictions outlined by Dr. Stromsdorfer in his medical assessment, there were no jobs she could perform. (Id. at 76.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms Plaintiff completed as part of the application process, documents generated pursuant to her applications, records from various health care providers, and assessments by an agency personnel and by her psychiatrist.

When applying for DIB and SSI, Plaintiff completed a Disability Report. (Id. at 147-55.) She listed her height as 5 feet 1 inch and her weight as 195 pounds. (Id. at 147.) Bipolar disorder and depression limited her ability to work by causing irrational thoughts, paranoia, anger, and violent outbursts. (Id. at 148.) They first bothered her in August 2003 and prevented her from working as of May 16, 2006, when she had to quit work due to anger problems with her co-worker and manager. (Id.) Her work had been as either a presser for dry cleaners or an assembly worker for an automobile manufacturing plant. (Id. at 149.) The

only medications she took were prescribed by her psychiatrist, Stephen Stromsdorfer, M.D., and none had any side effects.  (<u>Id.</u> at 153.)  She had completed the twelfth grade, but had no trade or vocational training.  (<u>Id.</u> at 153-54.)

Plaintiff also completed a Function Report.  (<u>Id.</u> at 164-71.)  She reported that she lived with family in a boarding house.  (<u>Id.</u> at 164.)  After she wakes up in the morning, she takes her medication, sometimes watches television, takes a shower if she has an appointment, fixes herself something to eat when she gets hungry, does light housework, waters the plants, and then takes her evening medications.  (<u>Id.</u>)  She takes care of her pets by feeding them and letting them out to relieve themselves.  (<u>Id.</u> at 165.)  If she cannot get out of bed, her mother takes care of the pets.  (<u>Id.</u>)  Before her illnesses, she could interact with other people and customers.  (<u>Id.</u>)  Her illnesses cause nightmares.  (<u>Id.</u>)  If she knows she is going to be out in public, she will bathe and groom.  (<u>Id.</u> at 166.)  The meals she prepares are fried eggs, sandwiches, or heated frozen dinners.  (<u>Id.</u>)  If a meal takes longer than thirty minutes to prepare, she does not bother.  (<u>Id.</u>)  She used to bake and grill, but no longer has the interest or patience to do either.  (<u>Id.</u>)  She may start doing laundry, but her mother will finish it.  (<u>Id.</u>)  She enjoys watching the news on television.  (<u>Id.</u> at 168.)  She is not as active as she used to be; consequently, she has gained 70 pounds.  (<u>Id.</u> at 168, 169.)  She sometimes has mood swings that make her angry and want to hurt herself or others.  (<u>Id.</u> at 169.)  Her impairments affect her ability to walk, sit, talk, hear, see, remember, complete tasks, concentrate, understand, follow instructions, and get along with others.  (<u>Id.</u>)  She has a bad ankle and cannot sit still.  (<u>Id.</u>)  She hears voices and sees things that are not there.  (<u>Id.</u>)  She can only

walk a few blocks before having to stop and rest.  (Id.)  She has to be repeatedly reminded of spoken instructions and has to repeatedly read written instructions.  (Id.)  If an authority figure is hostile, she becomes hostile.  (Id. at 170.)  She does not handle stress well, resulting in chest pain and anger.  (Id.)  She only drives when there is little traffic.  (Id.)

A Function Report was completed on Plaintiff's behalf by Hope Lipp, a friend who had known her for 21 years and spent time with her once a week.  (Id. at 172-80.)  She did not know what Plaintiff did during the day.  (Id. at 172.)  She reported that Plaintiff said she had weird dreams.  (Id. at 173.)  She did not know if Plaintiff's impairments affected her ability to take care of her grooming, her ability to remember to take medication, or her ability to do housework or yard work.  (Id. at 173-74.)  She did not know if Plaintiff did any shopping, spent time with others, needed reminders, could pay attention, or could follow instructions.  (Id. at 175-77.)  She did report that Plaintiff did not go outside often and thought that the sun aggravated her medications.  (Id. at 175.)  Plaintiff quickly would become moody and angry.  (Id. at 176.)  Plaintiff's impairments affected her memory, ability to concentrate, and ability to get along with others.  (Id. at 177.)  Ms. Lipp did not report that Plaintiff's impairments affected her ability to walk, sit, talk, hear, see, complete tasks, understand, or follow instructions.  (Id.)

A month later, Ms. Lipp completed another Function Report on Plaintiff's behalf, reporting that she had known her for 23 years and saw her twice a month.  (Id. at 181-88.)  In this report, Ms. Lipp noted that Plaintiff's impairments did also affect her ability to understand, stand, and follow instructions, in addition to affecting her ability to remember,

concentrate, and get along with others. (Id. at 186.) In other respects, the report was substantially similar to the one earlier completed.

Plaintiff completed another Disability Report after her applications were initially denied. (Id. at 193-200.) She described her condition as "worse" without any explanation. (Id. at 194.) She answered in the affirmative the question whether she had any new illnesses, injuries, or conditions since completing a disability report, but did not explain. (Id.) She listed May 2006 as the approximate beginning date of those new impairments. (Id.) She listed five doctors she had seen in August 2006, one was a gynecologist, one a podiatrist, one an orthopedist, one a primary care physician, and the sixth was Dr. Stromsdorfer. (Id. at 195-96.) She was taking four medications prescribed by Dr. Stromsdorfer: Lithium, Prozac, Wellbutrin, and Zyrtec. (Id. at 196.) The first three were for depression and bipolar disorder. (Id.) All made her drowsy. (Id.)

Plaintiff had also completed a Disability Questionnaire in December 2003 for the Missouri Department of Social Services. (Id. at 249-50.) She reported that the symptoms from her bipolar disorder and depression began in 1997 and prevented her from working as of 2003. (Id. at 249.)

Plaintiff's earnings records reflect employment from 1987 to 2006, inclusive. (Id. at 138.) Her highest earnings were $35,887.47, in 2002; her lowest were $689.50, in 2004 – the only year in which her earnings fell below $1,000 and the only year after 1990 that they fell below $10,000. (Id.)

With the exception of the records of Dr. Stromsdorfer, the medical records before the ALJ are summarized below in chronological order.[12]  A summary of Dr. Stromsdorfer's records follows the general medical records.

Plaintiff was voluntarily admitted to St. John's Mercy Medical Center on December 8, 2003, with a diagnosis of bipolar affective disorder, mixed, severe, with psychotic behavior.  (Id. at 203-47.)  She had attempted an overdose of a combination of Effexor, Ultracette, and Monopril.  (Id. at 216.)  Her mother had seen her taking the pills and had stopped her.  (Id.)  The month before, she had been in a drug rehabilitation program for cocaine and heroin.  (Id.)  She had not used either for one month.  (Id.)  Plaintiff reported that she had stopped taking her medications the month before after her insurance ran out.  (Id. at 212, 217.)  She had lost her job after not reporting to work.  (Id. at 212, 216.)  She had not been feeling well, but her doctor would not give her a slip because she had not seen him during the time she was off work.  (Id. at 212.)  She had no money, no self-esteem, no confidence, and no motivation.  (Id.)  She was paranoid and depressed.  (Id.)  She had a pending driving while intoxicated charge and had been drinking excessively, but no longer was.  (Id. at 212, 217.)  She denied any suicidal thoughts or hallucinations.  (Id. at 213.)  On examination, she was oriented to time, place, and person; had an intact general fund of knowledge, and an apparently average IQ.  (Id.)  She felt victimized by her former employer, Chrysler, although she realized it was her fault she lost her job.  (Id.)  The admitting

_____

[12]References to medical records for conditions unrelated to her listed impairments, e.g., an allergic reaction to a drug with sulfa, one instance of acid reflux, a sexually transmitted disease, and dermatologic reactions to unknown irritants.

physician, Fazle M. Yasin, M.D., placed her on Seroquel for sleep and Depakote, and directed her to participate in individual group and milieu therapy and to "confront[ ] and treat[ ] her alcohol abuse." (Id. at 213-14.) He assessed her GAF on admission as 40.[13] (Id. at 213.) It was noted in the records that she had begun drinking when eight years old. (Id. at 224.) Her physical problems included neck and shoulder pain. (Id. at 224, 229.) This pain had started "years ago," was "throbbing," and was a ten on a ten-point scale. (Id. at 229.) Her father had reportedly physically, mentally, and sexually abused her. (Id. at 225.) She had mentally abused her former boyfriend. (Id.) Plaintiff's strengths were a caring family. (Id. at 238.) Her short term goals were to be compliant with her medication. (Id.) Her long term goals were to follow-up with her psychiatrist or therapist and to develop alternate coping skills when she was depressed or moody. (Id.) The day after admission, her appetite and mood were good, but she refused to attend group therapy. (Id. at 220, 246.) On December 10, Plaintiff again refused to participate in group therapy. (Id. at 221, 243.) She had a court date that evening on her DWI charge. (Id. at 221.) She was discharged with a two-week supply of medications from her doctor and an increased dosage of Seroquel. (Id. at 203.) She was to follow up with a state-run mental health center. (Id. at 207.)

Plaintiff was voluntarily admitted to the hospital on February 29, 2004, and discharged on March 9. (Id. at 401-06.) She had been using crack cocaine on a regular basis, and had "strong thoughts of killing herself." (Id. at 401.) She was treated with several medications

---

[13]A GAF between 31 and 40 indicates "[s]ome impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking or mood . . . ." Diagnostic Manual at 34.

and consequently had an improved mood and affect. (Id.) After discharge, she was to follow-up with Dr. Stromsdorfer. (Id. at 405.)

On January 15, 2005, Plaintiff was taken to St. Joseph Health Center emergency room after being found by her boyfriend in an obtunded state of consciousness.[14] (Id. at 251-309.) She told the paramedics that she had taken an overdose to kill herself. (Id. at 288.) Blood work, including a drug screen, showed a possible toxic level of tricyclics serum[15] and was positive for cocaine and marijuana. (Id. at 251-60, 280, 289-93.) A chest x-ray showed no evidence of acute cardiopulmonary disease. (Id. at 262.) An electocardiogram ("EKG") indicated sinus tachycarida. (Id. at 263-65, 285.) Plaintiff was admitted to the hospital. Her past medical history included bipolar disorder. (Id. at 269, 287.) She reported that she had discontinued her psychotropic medication and had recently relapsed to using cocaine and marijuana after an argument with her mother. (Id. at 267.) An EKG done on January 17 was within normal limits. (Id. at 271-72.) On discharge on January 18, she agreed to resume taking Zoloft. (Id. at 267.) The diagnosis was major depressive disorder, recurrent, cocaine and marijuana abuse and recent relapse. (Id.) Her GAF was 45 to 50.[16] (Id.)

---

[14]An obtunded level of consciousness is characterized by reduced alertness and excess sleep. Nursing Link, http://nursinglink.monster.com/training/articles/291-altered-levels-of-consciousness (last visited March 11, 2010). It is "often seen with substance abuse in the form of narcotic or alcohol overdosage." Id.

[15]Tricyclics are a chemical group of antidepressants. medLexicon, http://www.medilexicon. com/medicaldictionary.php (last visited March 11, 2010).

[16]A GAF score between 41 and 50 is indicative of "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." Diagnostic Manual at 34.

Complaining of constant chest pain that had begun the day before, Plaintiff went to the St. John's Mercy Medical Center ("St. John's") emergency room on May 26. (Id. at 339-52.) She described the pain as being worse with movement or when she took a deep breath. (Id. at 340.) She denied having any shortness of breath or a cough. (Id.) A computed tomography ("CT") scan and x-rays of her chest were normal. (Id. at 346, 351-52.) It was then noted that the cause of her pain was uncertain. (Id. at 348.) She was discharged with instructions to watch for certain warning signs indicative of a serious problem that might take time to appear, to rest that day and avoid strenuous activity, and to follow-up with Cindy Chu, M.D.; she was released to return to work. (Id. at 345, 347-49.)

Plaintiff was admitted to St. John's again on November 12 after injuring her left ankle and spraining her right ankle in a fall from an all-terrain vehicle ("ATV"). (Id. at 312-38, 367-70.) She was described as being a poor historian. (Id. at 368.) She could not recall her pyschotropic medications or dosages. (Id. at 315.) She put all her psychotropic medications in one big bottle and took them out of that. (Id. at 316.) X-rays revealed a left ankle dislocation with fibular fractures. (Id. at 316, 331-33.) She was 5 feet 2 inches and weighed 185 pounds. (Id. at 317.) Two days after admission, she had an open reduction and internal fixation of her left ankle. (Id. at 318, 335-38.) At discharge on November 21 she was "doing quite well" and "[h]er pain was under good control." (Id. at 312, 313.)

Andrew Spitzfaden, M.D., removed her splint on December 2. (Id. at 421.) He noted that her instructions on discharge were that she was be nonweightbearing and use crutches, but she had been walking on the splint, which was badly worn and destroyed on the plantar

surface.  (Id.)  She was able to flex her left ankle with minimal discomfort.  (Id.)  An x-ray showed good alignment with the hardware in a good position.  (Id.)  He wanted her to stay off her ankle for a few more weeks, but was informed by Plaintiff that she was going to walk on it regardless of what he said.  (Id.)  He gave her a boot to wear at all times and scheduled her for a return visit in one month.  (Id.)  When Plaintiff did return, on December 30, she reported that she had been weightbearing without the boot.  (Id.)  She was back a work, full-time.  (Id. at 422.)  She had some discomfort and was wearing her air splint.  (Id.)  On examination, she had some swelling but normal flexion in the left ankle.  (Id.)  X-rays revealed normal healing.  (Id.)  Dr. Spitzfaden asked her to wear the boot for a few more weeks and to return in six weeks for additional x-rays.  (Id.)  She asked that her prescription for Darvocet be changed to one for Vicodin, but was satisfied with a prescription for Tylenol #3.  (Id.)  Prescriptions for Darvocet were renewed, however, on January 9, 2006, January 23, and February 3.  (Id.)

When Plaintiff next saw Dr. Spitzfaden, on February 10, she reported that her ankle continued to ache, she was on her feet eight to ten hours a day, she was wearing the air splint, and she continued to take the Darvocet.  (Id. at 422-23.)  On examination, her ankle was slightly swollen and had zero degrees of dorsiflexion.  (Id. at 423.)  She had full plantar flexion and no pain with inversion or eversion.  (Id.)  She was to start physical therapy and to take Feldene, a nonsteroidal anti-inflammatory, once a day.  (Id.)  Three days later, Plaintiff requested a refill of Darvocet.  (Id.)  She was given one with the warning that there would be

no further refills.  (Id.)  A request from a pharmacy for a refill of Tylenol # 3 two weeks later was denied.  (Id.)  In April, a refill request for Feldene was approved.  (Id.)

On April 27, Plaintiff telephoned Dr. Spitzfaden's office with complaints of pain and an impression the hardware was "backing out of her ankle."  (Id. at 423-34.)  She was scheduled for an appointment with him for May 5.  (Id. at 424.)  At that time, she had a full range of motion in her left ankle and no pain.  (Id.)  X-rays revealed some degenerative change in her tibiotalar joint.  (Id.)  The hardware was in a good position.  (Id.)  Dr. Spitzfaden explained to Plaintiff that her earlier failure to follow his nonweightbearing instructions might cause her ankle to take longer to heal and that her level of activity was going to amplify her pain.  (Id. at 424-25.)  Plaintiff's prescription for Darvocet was refilled on May 8[17] and again on May 22, at which time she and the pharmacy were informed the prescription would not be refilled again.  (Id. at 425.)  On July 12, someone at the pharmacy called to question an authorization for a refill of Darvocet given by Dr. Spitzfaden's triage nurse.  (Id.)  The nurse had done so when Plaintiff had complained of pain and denied having any other pain medications.  (Id.)  Plaintiff had obtained a prescription for another pain medication, Vicodin, from an urgent care center.  (Id.)  The Darvocet was not renewed.  (Id.)  After a complaint from Plaintiff about pain, she was given a limited renewal of Darvocet and an earlier appointment.  (Id.)  This prescription also was cancelled after it was learned that

---

[17]Although Dr. Spitzfaden had indicated that he was going to switch Plaintiff's medication to Ultram, her other medications precluded this.  (Id. at 423-24, 425.)

Plaintiff had presented a new prescription from an urgent care center for Vicodin.  (Id. at 426.)

Plaintiff saw Dr. Spitzfaden on July 18, complaining of left heel pain and admitting that it might not have been a good idea not to follow his earlier instructions.  (Id. at 426-27.) On examination, she had some swelling and tenderness in her left ankle.  (Id.)  She could dorsiflex to 10 degrees and plantar flex to 20 degrees.  (Id.)  The assessment was left Achilles tendinitis and increased pain and some degenerative changes of the left ankle joint.  (Id.)  She was given another walking boot, a prescription for Naprosyn, and a refill of Darvocet.  (Id.) She was to wear the boot at all times when walking and was to be referred to Dr. Aubuchon if there was no improvement.  (Id.)

When Plaintiff called on August 7 for more pain medication, she was told that Dr. Spitzfaden wanted her to see Dr. Aubuchon.  (Id.)  She refused, informing the nurse that she would keep her earlier-scheduled appointment with Dr. Spitzfaden.  (Id. at 428.)  On examination at that appointment, Plaintiff was sore to the touch all over her left foot.  (Id.) She was referred to Dr. Brett Grebing and given a prescription for Vicodin.  (Id.)

The next week, Plaintiff saw a podiatrist, Daniel Riddy, D.P.M.  (Id. at 430-32.)  She was given a prescription for Ultram.[18]  (Id. at 432.)

The next month, Plaintiff saw a different podiatrist, Neil S. Sandberg, D.P.M.  (Id. at 434-35.)  He referred her to Dr. Perry when she failed to appear for an appointment.  (Id. at 435.)

---

[18]See note 17, supra.

Plaintiff was examined by Dr. Grebing on August 31.  (Id. at 476-78, 487.)  She reported that her ankle pain was sharp and sometimes aching and was moderate to severe.  (Id. at 476.)  Her height was 5 feet 2 inches and her weight was 195 pounds.  (Id.)  On examination, she had a restricted range of motion in her left ankle, which was swollen.  (Id. at 477.)  X-rays showed a collapse of the lateral portion of the tibial plafond; valgus malalignment of her ankle and talus; and medial joint widening and degenerative changes of the ankle joint.  (Id. at 477, 487.)  Dr. Grebing opined that she had a severe ankle fracture.  (Id. at 477.)  Her fracture had healed well, but had then collapsed due to "the increased energy."  (Id.)  He discussed with Plaintiff the various treatment options, ranging from wearing a custom-made brace to surgery.  (Id.)  The former was to be tried first.  (Id.)

On September 19, Plaintiff consulted John T. Moore, M.D., about the pain in her left foot.  (Id. at 447.)  She informed Dr. Moore that she had been told by Dr. Spitzfaden that there was nothing wrong with her foot and that another doctor had told her she would need another operation, but Dr. Spitzfaden refused.  (Id.)  Dr. Moore prescribed Vicodin and recommended that she continue to work with her previous doctors.  (Id.)  Plaintiff returned to Dr. Moore the next month, explaining that the Vicodin was not relieving her pain.  (Id. at 448.)  He prescribed Percocet.  (Id.)

On October 3, Plaintiff consulted the physicians at the Wohl Clinic at Barnes Jewish Hospital about her left ankle pain.  (Id. at 558-66.)  She described that pain as a ten and unrelieved by over-the-counter medication.  (Id. at 562.)  She also had pain in her right knee and hip, made worse by putting more pressure on the knee.  (Id.)  Physical and occupational

therapy were offered, but refused.  (Id. at 565.)  She was given a prescription for Vicodin and was to return in one month.  (Id. at 566.)

Plaintiff returned to Dr. Grebing on October 10, reporting that the brace was ineffective and that she continued to have pain and instability in her left ankle.  (Id. at 474-75.)  Consequently, she was not able to stand for any length of time.  (Id. at 475.)  After a discussion, Plaintiff elected to proceed with the arthrodesis (joint fusion) surgery.  (Id.)  She was cautioned that her ankle would be permanently stiff following the surgery and was also told that her cigarette habit would interfere with her healing and that she must be nicotine free, as verified by a blood test, for two weeks before the surgery.  (Id.)

Although the blood test was positive for cigarette smoking, Plaintiff had the surgery on October 30, stating that she would stop smoking afterwards.  (Id. at 489-91.)  Four days later, x-rays showed overall good alignment in her ankle.  (Id. at 473, 486.)  She was placed in a nonweightbearing cast, given a bone stimulator to improve healing, and warned again about the deleterious effect smoking had on healing after she reported that she was down to one-half pack of cigarettes a day.  (Id. at 473.)

After falling two days earlier and having an increase in left ankle pain, Plaintiff was seen in Dr. Grebing's office by John Carlisle, M.D., on November 9.  (Id. at 471-72, 488, 556-57.)  Her cast was removed; her ankle was x-rayed.  (Id. at 471, 488.)  There was no change, no evidence of acute injury, and an expected amount of pain.  (Id. at 471.)  Plaintiff requested a refill of her pain medication.  (Id.)  A limited prescription was given sufficient to last Plaintiff until she could contact Dr. Grebing the following Monday.  (Id. at 472.)  After noting

that her old cast was dirty and wet, Dr. Carlisle emphasized to Plaintiff that the cast was not a walking cast and that she was not to bear any weight on her left lower extremity. (Id.) He also informed Plaintiff that her pain was likely secondary to her attempts at weight bearing. (Id.) Plaintiff said she understood. (Id.)

When Dr. Grebing saw Plaintiff on November 28, he asked her about whether she had kept off her left ankle and had stopped smoking. (Id. at 469-70, 485.) She had done neither. (Id. at 469.) She had been putting pressure on the left foot due to right knee pain and was smoking one-half pack of cigarettes a day. (Id.) X-rays showed well maintained alignment and three broken screws. (Id.) Dr. Grebing stressed the likelihood that further surgery would be necessary if she continued to walk in the cast. (Id.) He placed her in a new cast, gave her a prescription for a wheelchair, and refilled her pain medication for oxycodone for breakthrough pain. (Id. at 469-70.) He also cautioned her that that was to be the last prescription for oxycodone. (Id. at 470.)

Plaintiff's cast had to be reinforced the next week after she continued to walk on it. (Id. at 468.)

When seen for her regularly scheduled appointment, on December 19, Plaintiff reported experiencing "some pain" in her left ankle, which was worse when she put weight on it. (Id. at 466-67, 484.) Dr. Grebing again explained about the problems with bearing weight too early on her ankle. (Id. at 466.) She was placed in a new cast. (Id.)

Plaintiff returned to Dr. Grebing on January 12, 2007, reporting that she was "down to about half a pack of cigarettes per day." (Id. at 465, 483.) She had not been placing any

weight on her left ankle.  (Id. at 465.)  X-rays indicated a well-maintained alignment at the arthrodesis site.  (Id.)  Plaintiff was placed in a weightbearing cast and was told, when she requested more narcotic medicine, that Dr. Grebing would check with her primary care physician before ordering any.  (Id.)

Plaintiff saw Dr. Moore again on January 22, reporting that she had been using a walker for two years due to a previous ankle injury, that her right knee was getting progressively more painful, and that she had slipped on the ice the day before and had twisted the knee.  (Id. at 449.)  She had an appointment with an orthopedic surgeon in a few days but needed some pain medication in the interim.  (Id.)  Dr. Moore prescribed Vicodin.  (Id.)

The next day, Plaintiff also consulted Ubaldo Rodriquez, M.D., about her right knee. (Id. at 504-05, 511-13.)  She was diagnosed with degenerative joint disease and prescribed Darvocet.  (Id. at 504.)  Right knee x-rays taken on January 26 revealed hypertrophic spur formation in both knees, joint effusion in right knee, and bilateral patellar subluxation.  (Id. at 481-82.)

On January 30, she told Dr. Moore that an MRI of her knee was negative.[19]  (Id. at 450.)  She did not believe it.  (Id.)  Her knee was still swollen and painful.  (Id.)  The pain medication was not working.  (Id.)  Dr. Moore declined to prescribe any narcotics, told Plaintiff to use over-the-counter medication, and to return in one month if no better.  (Id.)

The same day, Plaintiff saw Mark Halstead, M.D., also about her right knee pain.  (Id. at 463-64, 551-54.)  She reported that her mother had died and she was applying for disability

---

[19]The MRI was negative.  (Id. at 460.)

to help with her finances.  (Id. at 552.)  She could not afford the gas to go to rehabilitation.  (Id.)  He noted that she asked him "repeatedly throughout the patient visit for varying types of narcotics" and declined her requests, explaining that she was already receiving some from Dr. Grebing and her primary care physician and that such medication was not the way to approach her osteoarthritis.  (Id. at 464.)  He also encouraged her to lose weight, once the problem with her ankle had resolved.  (Id.)  He gave her an aspiration and injection, first removing some fluid from her swollen knee and then injecting the site with lidocaine (a local anesthetic), Marcaine (a numbing medicine), and Depo-Medrol (an anti-inflammatory).  (Id.)

After Dr. Grebing saw Plaintiff on February 6 and an ankle x-ray showed no change, Plaintiff was given a fracture boot to be worn at all times.  (Id. at 480, 724-25.)

Plaintiff returned to Wohl Clinic on February 12 for her right knee pain.  (Id. at 547-50.)  She explained that she now had transportation and could attend physical therapy.  (Id. at 548.)  She was given a referral to a physical therapy center near her home and a prescription for Vicodin, with no refills.  (Id.)

Plaintiff saw Dr. Rodriquez again two days later.  (Id. at 503.)  She was to return in two to three weeks to have the fluid drained from her knee if there was no improvement.  (Id.)  Plaintiff did return, but there is no indication in the record that her knee was drained then or when she saw him again on March 20.  (Id. at 501-02.)

An MRI of Plaintiff's right knee taken on March 2 revealed mild early osteoarthritis and chondromalacia of the patella involving the lateral facet with small joint effusion, but no acute bony abnormality.  (Id. at 509.)

Four days later, Plaintiff returned to the Wohl Clinic for her left foot pain and a renewal of her pain medication, explaining that the Vicodin was not working and she needed something stronger. (Id. at 544-46.) After speaking with two pharmacists and noting that a refill was given one week earlier and that Plaintiff had a history of going to multiple pharmacies and getting prescriptions from multiple doctors, her medication request was denied. (Id. at 546.)

Plaintiff kept her regularly scheduled appointment at the Wohl Clinic on March 12. (Id. at 540-43.) She reported that she was using her pain medication faster than scheduled and was advised against doing so. (Id. at 541.) Her prescription for Vicodin was renewed. (Id.)

On March 29, Plaintiff saw another doctor in Dr. Rodriquez's practice, Allen G. Adams, M.D. (Id. at 498-500.) She reported that she had no history of any drug abuse and smoked one-half pack of cigarettes a day. (Id. at 500.) He injected her right knee with xylocaine, a numbing medication. (Id. at 498.)

On April 3, Plaintiff returned to Dr. Grebing. (Id. at 462, 479, 721-23.) She reported that she had been doing well until the week before when she had slipped getting out of the bathtub. (Id. at 721.) She had not been wearing the boot for several days and had not been using the bone stimulator for a month. (Id.) With the boot on, her pain was better. (Id.) Dr. Grebing noted that her swelling was less than when he had last seen her. (Id.) X-rays of her left ankle showed no change. (Id. at 479, 722.) She was to return in three months. (Id. at 722.)

Plaintiff consulted Dr. Adams on April 12. April 24, May 10, May 22, and May 24. (Id. at 493-97, 506-08.)  At the last two visits, she rated her pain as a five to six on a ten-point scale.  (Id. at 493.)

During the period she was seeing Dr. Adams, Plaintiff was also being treated at the Wohl Clinic.  (Id. at 529-39.)  On April 26, x-rays revealed an interval decrease in size of the small right knee effusion, persistent mild tricompartmental osteoarthritis of the right knee, and persistent lateral patellar subluxation bilaterally.  (Id. at 537-38.)  On May 9, she requested a refill of her prescriptions and signed a contract agreeing not to seek narcotics from other physicians.  (Id. at 530, 532.)  She also reported that she was having migraines since her mother's death.  (Id. at 529.)  The migraines were made worse by stress and insomnia.  (Id.)

On June 5, Plaintiff reported that her knee pain was controlled with her current pain medications.  (Id. at 524-27.)  She wanted to have a nerve block, but was going to wait until after a scheduled hysterectomy.  (Id. at 525.)  Her migraines, however, were not helped by her current medication.  (Id.)  Plaintiff was prescribed an anti-depressant to stop the migraines from occurring.  (Id. at 526.)  When Plaintiff next returned to Wohl Clinic, on July 2, she was compliant with her pain medication contract.  (Id. at 517-23.)  Her migraines were stopped with her current medication, Relpax.  (Id. at 518.)  Before trying a nerve block, she wanted to lose weight to see if that helped relieve her knee pain.  (Id.)  Her weight was 193 pounds. (Id.)  When Petitioner returned on August 3 for a medication refill, she described her leg pain as an eight.  (Id. at 515-16.)

Plaintiff was admitted to DePaul Health Center on January 28, 2008, after experiencing an acute exacerbation of mood instability. (Id. at 605-09.) She tested positive for cocaine use. (Id. at 608.) It was noted that she had limited insight and was noncompliant with treatment. (Id. at 606.) She was discharged one week later, on February 5, in stable condition to the Bridgeway program, a residential chemical dependence treatment center. (Id.)

The same day, she consulted Nighat Qadri, M.D., with Crider Health Center, about her migraines. (Id. at 693-97.) She informed him she was going into rehabilitation for 40 days for treatment of cocaine abuse. (Id. at 695.)

Two days after discharge, she was admitted to St. John's with a diagnosis of bipolar disorder with psychotic features. (Id. at 611-55.) Prior to admission and for the past few days, she had used crack cocaine. (Id. at 621.) The physician, Stephen C. Stromsdorfer, M.D., noted that her deterioration in mood was caused by her relapse with cocaine. (Id. at 620.) Plaintiff was treated with phenobarbital. (Id. at 612.) When discharged on February 14, her mood had improved and she was minimally depressed. (Id. at 612, 634.)

Three days after discharge, Plaintiff went to the emergency room at St. Joseph Hospital, explaining that she had lost her prescription when at St. John's. (Id. at 657-62.) She smoked two packs of cigarettes a day. (Id. at 658.) Her gait was normal, but her back was tender. (Id. at 661.) She was given a prescription for three medications, Ativan, Seroquel, and Lamictal, and instructed to contact her doctor for the others. (Id. at 662.)

Plaintiff consulted Devyani Hunt, M.D., on March 18 about her right knee pain. (Id. at 672-76, 682-84.) On examination, Plaintiff walked without a significant gait deviation.

(Id. at 673.)  Her right knee was tender on the medial and lateral jointline, and she had pain with full flexion and extension.  (Id.)  Her lower back was tender over the right posterior/superior iliac spine.  (Id.)  She had increased pain with forward flexion, but not with extension.  (Id.)  She was to be treated first with physical therapy and, if that failed, then steroid injections.  (Id. at 673-74.)

On April 9, Plaintiff consulted Sandra Klein, M.D., about her left ankle pain.  (Id. at 665-68, 677-81, 685-89.)  On examination, she walked with a "relatively normal gait" and "very mild limp."  (Id. at 666.)  She had no significant swelling and had an excellent alignment in her ankle.  (Id.)  She had a very flexible forefoot and a subtalar range of motion with 10 degrees of inversion and of eversion.  (Id.)  She reported having a small area of numbness around an incision but was unable to locate its exact location.  (Id.)  She was mildly tender to palpation over a prominent screw on her medial side and had some minimal tenderness at her ankle joint fusion.  (Id.)  Dr. Klein opined that Plaintiff's ankle was very stable but might be starting to hurt more because Plaintiff was using her left foot more given the pain in her right knee.  (Id. at 667.)  The treatment plan was for an over-the-counter brace that could fit in Plaintiff's shoe.  (Id.)  Plaintiff inquired about pain medication, but was told that she would have to make do with the previously-prescribed prioxicam, an anti-inflammatory.  (Id.)

On April 24, Plaintiff saw Dr. Qadri for left upper rib pain.  (Id. at 691.)  She had a lump in her right breast and was to have a diagnostic mammogram.  (Id.)  Chronic obstructive pulmonary disease is listed without explanation as an impairment.  (Id.)

Plaintiff had a steroid injection in her right knee on July 8.  (Id. at 732-33.)

The office records of Dr. Stromsdorfer that were before the ALJ[20] are of a checklist format and begin following Plaintiff's 2004 hospitalization.  See page 15, supra.  Unless otherwise noted, her hygiene and appearance were "unremarkable,"[21] her flow of thought was "logical,"[22] her gait was "steady,"[23] and her concentration was "intact."[24]  Suicidal ideation was never present, and her orientation, if remarked on, was always "intact."  Unless otherwise noted, she did not have any hallucinations or delusions.

On March 17, 2004, Plaintiff was reportedly doing better and was to additionally take Buspar.  (Id. at 400.)  Her depression was a two to three on a ten-point scale[25] and her anxiety was a seven to eight.  (Id.)  She had a GAF of 60.[26]  (Id.)

Two weeks later, Plaintiff continued to do well.  (Id. at 399.)

On April 21, Plaintiff was doing better and sleeping regularly.  (Id. at 396.)  She had not relapsed.  (Id.)  Her GAF was 80.[27]  (Id.)  May 26, Plaintiff was doing well, sleeping okay,

---

[20]As noted below, additional records from Dr. Stromsdorfer were submitted to the Appeals Council.

[21]The other choices are "disheveled" and "dysphoric."

[22]The other choices are "goal directed," "circumstantial," "tangential," and "loose associations."

[23]The other choices are "impaired gait" and "abnormal."

[24]The only other choice is "compromised."

[25]The scale used is always a ten-point scale, with ten being the worst.

[26]See note 8, supra.

[27]See note 10, supra.

and working part-time at a dry cleaner.  (Id. at 398.)  Her current GAF was 75.  (Id.)  The following month, Plaintiff had a mild level of anxiety and depression and a GAF of 80.  (Id. at 397.)  It was noted that she had had a slight worsening of her mood due to missed doses of her medication and was cautioned to be consistent with the doses, especially those of the Buspar.  (Id.)  She could return to work by the end of July.  (Id.)

Plaintiff did not appear for her September appointment.  (Id. at 395.)

Plaintiff voluntarily admitted herself to the hospital on October 28.  (Id. at 391-94.)  She reported that she had stopped taking her medications the previous June and had resumed using cocaine then.  (Id. at 393.)  Her depression, anxiety, and suicidal ideation had increased.  (Id.)  Her sleep, energy level, concentration, and interest in activities had been negatively affected.  (Id.)  She had become involved with a man who undermined her treatment and who had contributed to her cocaine relapse.  (Id. at 394.)  She was described as being "obviously medication-seeking" and "requested various benzodiazepines."  (Id.)  She was told that the latter were not an option "given her addictive patterns and lack of reliability."  (Id.)  Her GAF was 50.  (Id. at 393.)  At discharge eight days later, her GAF was 60.  (Id. at 391.)  She had been treated with the medications previously prescribed.  (Id.)  Her depression and anxiety had completely resolved.  (Id.)  Her impulse control was good.  (Id.)  She was calm, hopeful, and instructed to attend 12-step meetings at least twice a week.  (Id. at 392.)

On November 17, Plaintiff had an anxiety level of five on a ten-point scale and a depression level of three.  (Id. at 390.)  She was reportedly doing better.  (Id.)

On December 7, Plaintiff had a dyshoric appearance, was anxious and depressed, had compromised concentration, and a GAF of 65. (Id. at 389.) Three weeks later, Plaintiff's weight had increased to 175 pounds from 138 pounds. (Id. at 388.) She had no anxiety or depression. (Id.) Her GAF was 70. (Id.)

Plaintiff reported on January 20, 2005, that she had had a brief relapse that had led to a two-day hospitalization. (Id. at 387.) Dr. Stromsdorfer described her levels of anxiety and depression as low and assessed her GAF as 65. (Id.) The next month, Plaintiff was reportedly doing well but anxious. (Id. at 386.) Her depression was a two on a ten-point scale; her anxiety was a seven. (Id.) She had a GAF of 65. (Id.)

On March 23, Plaintiff reported that she was feeling worse, had been physically attacked, and was going to Narcotics Anonymous meetings. (Id. at 385.) Her anxiety and depression levels were three to four on a ten-point scale. (Id.) Her GAF was 60. (Id.) On April 20, Plaintiff was described as having a more prominent depression and a low drive. (Id. at 384.) Her depression was a seven on a ten-point scale and her anxiety was an eight. (Id.) She was restless. (Id.) Her GAF was 60. (Id.)

The next week, Plaintiff had a depressed and calm affect and a GAF of 65. (Id. at 383.)

On May 18, Plaintiff told Dr. Stromsdorfer that she was doing well and feeling better than she had in a long time. (Id. at 380.) She had a euthymic mood and affect. (Id.) Her GAF was 70. (Id.) Dr. Stromsdorfer told her to "continue as is." (Id.)

When Plaintiff next saw him, on July 15, Plaintiff had a low level of depression and a high level of anxiety, a euthymic affect, and a GAF of 70.  (Id. at 374.)  The next month, Plaintiff was reported to be in a good mood.  (Id. at 373.)  She had a GAF of 80.  (Id.)  In September, Plaintiff's anxiety level was a two and her GAF was 70 or 80.[28]  (Id. at 372.)  Two months later, Plaintiff's anxiety and depression levels were one to two and her GAF was 70.  (Id. at 366.)

On January 27, 2006, Plaintiff had a dysphoric appearance, an anxiety and depression level of six, a depressed affect, and a GAF of 80.  (Id. at 365, 603.)  She had been sober for one year.  (Id.)  On March 10, that Plaintiff had a dysphoric appearance, an anxiety and depression level of four on a ten-point scale, a depressed affect, and a GAF of 65.  (Id. at 363, 601.)

Plaintiff did not keep an April 21 appointment.  (Id. at 362, 600.)

On April 28, Plaintiff had a low anxiety level, a low level of depression, a steady but abnormal gait, and a GAF of 70.  (Id. at 361, 599.)  She was described as doing okay, was to "continue as is," and was to return in two months.  (Id.)

Dr. Stromsdorfer marked on June 7 that Plaintiff had a dysphoric appearance, an anxiety level of ten on a ten-point scale, a level of depression that was an eight on a ten-point scale, and a GAF of 60.  (Id. at 359, 597.)  Her medications included Wellbutrin, Proxac, and Klonopin.  (Id.)  Two weeks later, Plaintiff had a dysphoric appearance, a depressed and

_____

[28]The exact number is illegible.

anxious affect, a high level of anxiety and depression, and a GAF of 60.  (Id. at 596.)  She was to return in three weeks.  (Id.)  She missed that appointment.  (Id. at 595.)

On July 31, Plaintiff had a dysphoric appearance, a depressed affect, a high level of anxiety and depression, and a GAF of 60.  (Id. at 594.)  Plaintiff missed her next, August 21 appointment.  (Id. at 592-93.)  When she did return, one week later, she had a dysphoric appearance, a depressed and anxious affect, a high level of anxiety and depression, and a GAF of 60.  (Id. at 591.)  She was to return in one week.  (Id.)

Plaintiff returned three weeks later with a dysphoric appearance, a depressed and anxious affect, a level of anxiety that was a nine, a level of depression that was a seven, and a GAF of 60.  (Id. at 590.)  She was doing worse; headaches were a problem.  (Id.)  Her prescription for Prozac was changed to Cymbalta.  (Id.)  She was to return in two weeks.  (Id.)

On October 7, Plaintiff had a dysphoric appearance, a depressed affect, a level of anxiety that was a ten, a level of depression that was a seven, and a GAF of 65.  (Id. at 588.)  She was doing better.  (Id.)  Three weeks later, she had a dysphoric appearance, a depressed affect, a level of anxiety that was an eight to nine, a level of depression that was a six, and a GAF of 65.  (Id. at 587.)

On November 20, Plaintiff's appearance was again unremarkable appearance.  (Id. at 586.)  Her level of anxiety was a five, her level of depression was a two, and her GAF was 65.  (Id.)

On January 2, 2007, Plaintiff had a dysphoric appearance, a depressed affect, a high level of anxiety and depression, and a GAF of 60.  (Id. at 585.)  Her mother had died.  (Id.)

Ten days later, Plaintiff had a mildly dysphoric appearance, a calm affect, a level of anxiety and depression that was a seven, and a GAF of 65. (Id. at 584.) She was reportedly doing better. (Id.) On February 7, Plaintiff had an unremarkable appearance, a low level of anxiety and depression, and a GAF of 65. (Id. at 583.) She was reportedly doing okay. (Id.)

Dr. Stromsdorfer received a message from a pharmacy on February 21 that Plaintiff was requesting a refill of her prescription for Clonazepam, used for the treatment of epilepsy and panic disorders. (Id. at 572.) She had been given a prescription five days earlier for 120 tablets of 1 milligram Clonazepam and was requesting a new prescription for .5 milligrams. (Id.) Dr. Stromsdorfer declined. (Id.)

On April 2, Plaintiff had an unremarkable appearance, a depressed affect, a level of anxiety and depression that was a four, and a GAF of 65. (Id. at 582.) Her left foot was still bothering her, and she was waiting for disability. (Id.) The next month, Plaintiff had a low level of anxiety and depression and a GAF of 65. (Id. at 581.) Two weeks later, Plaintiff had a dysphoric appearance, a calm affect, a high level of anxiety and depression, and a GAF of 65. (Id. at 578.) She was suffering from migraines. (Id.)

On June 20, Plaintiff had an unremarkable appearance, a calm affect, and a GAF of 70. (Id. at 577.) She was described as doing well and was to return in one month. (Id.) In July, her anxiety and depression levels were low and GAF was 70. (Id. at 361, 720.) She continued to not use cocaine. (Id.) She was to return in two months. (Id.)

Plaintiff returned on September 25 with a dysphoric appearance, a high level of anxiety and a low level of depression, and a GAF of 60. (Id. at 718.) Plaintiff's appearance the next

month was unremarkable, her anxiety level was medium, her depression level was low, and her GAF was 65. (Id. at 717.) She was reportedly doing "a little better." (Id.)

Plaintiff did not keep her November 13 or December 5 appointments. (Id. at 715-16.)

Plaintiff did keep her December 12 appointment, at which she had a dysphoric appearance, a depressed affect, a level of anxiety that was a nine and a level of depression that was an eight, and a GAF of 60. (Id. at 714.) When she saw Dr. Stromsdorfer again ten days later, she was not doing any better. (Id. at 713.) He recommended that she pursue vocational rehabilitation. (Id.)

Plaintiff was doing better on January 22, 2008. (Id. at 721.) She then had an unremarkable appearance, a calm affect, a level of anxiety and depression that was a two, and a GAF of 65. (Id.) On February 6, Plaintiff reported that she had relapsed in her cocaine use. (Id. at 711.) The residential treatment center wanted to wean her off two medications that were controlled substances. (Id.)

When Plaintiff saw Dr. Stromsdorfer on March 10, she had an unremarkable appearance, a level of anxiety that was a five and of depression that was a three, and a GAF of 65. (Id. at 705.) He noted that she was slightly better and less anxious. (Id.) Nine days later, she had a tearful, dysphoric appearance and a high level of anxiety and depression. (Id. at 702.) Her GAF was not listed. (Id.)

Two weeks later, Plaintiff had an unremarkable appearance, a level of anxiety that was ten, no depression, and a GAF of 65. (Id. at 701.) She was reportedly doing better. (Id.)

In addition to the foregoing records of Plaintiff's medical treatments, documents relating to her medical condition were before the ALJ, including written statements by Dr. Stromsdorfer.

In July 2006, J. E. Bucklew completed a Psychiatric Review Technique form ("PRTF") for Plaintiff, listing depression and substance abuse as disorders that were severe but not expected to last twelve months. (<u>Id.</u> at 407-19.) Her credibility was described as lessened by complications from drug abuse and, with abstinence and treatment compliance, her mental disorder symptoms did not impose severe limitations. (<u>Id.</u> at 419.) Her mental disorders resulted in mild difficulties in maintaining social functioning, concentration, persistence, or pace. (<u>Id.</u>) They did not result in any restriction in her activities of daily living or in any episodes of decompensation. (<u>Id.</u> at 417.)

In September 2007, Dr. Stromsdorfer completed a Psychiatric Assessment for Social Security Disability Claim for Plaintiff. (<u>Id.</u> at 569.) He reported that Plaintiff had good control when she followed his prescribed medication regimen. (<u>Id.</u>) She had shown good motivation, and he had seen no signs of a relapse with cocaine, which had had a severe impact on her. (<u>Id.</u>) He opined, however, that she was not capable of working 40 hours a week in competitive employment. (<u>Id.</u>)

In April 2008, Dr. Stromsdorfer completed a Supplemental Psychiatric Assessment for Social Security Disability Claim and an Assessment of Ability to Do Work-Related Activities (Mental) for Plaintiff. (<u>Id.</u> at 699-700.) He reported that Plaintiff's mood fluctuations had occurred in the past few months with some improvement. (<u>Id.</u> at 699.) The diagnosis

remained bipolar disorder with cocaine dependence.  (Id.)  The treatment was medication.  (Id.)  She was unable to engage in sustained, full-time employment.  (Id.)  In the eight activities relevant to making occupational adjustments, Plaintiff had a poor ability to do each.  (Id. at 700.)  She also had poor ability to do the three functions relevant to making performance adjustments and in two of the four activities relevant to making personal-social adjustments.  (Id.)  She had a fair ability to maintain her personal appearance and to demonstrate reliability.  (Id.)

On May 20, Dr. Stromsdorfer answered a written request that he explain the inconsistency between his opinions about Plaintiff's ongoing disability and his GAF assessments. (Id. at 726.)  He replied that Plaintiff's functioning was moderately impaired without the demands of a work environment and that she would significantly deteriorate if she had work responsibilities.  (Id.)  Moreover, she primarily had a GAF of 60.  (Id.)

## The ALJ's Decision

After outlining the Commissioner's five-step sequential evaluation process, the ALJ found at step one that Plaintiff met the requirements for DIB only through December 31, 2009, and at step two, that she had not engaged in substantial gainful activity at any relevant time.  (Id. at 9-10.)  The ALJ next found at step three that Plaintiff had severe impairments of residuals after fracture of left ankle, obesity, bipolar disorder, and cocaine abuse.  (Id. at 11.)  Her impairments, singly or in combination, did not meet or medically equal an impairment of listing-level severity.  (Id.)

After summarizing Plaintiff's testimony and the medical history, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to lift or carry up to twenty pounds occasionally and ten pounds frequently and to sit for at least six hours and stand or walk for up to two hours, with normal breaks, in an eight-hour workday.  (Id. at 11-15.)  She was to avoid the use of ladders or scaffolds, could not squat, and should not work where her body might be jolted.  (Id. at 11.)  She could not walk on uneven surfaces or be subject to concentrated exposure to cold temperatures.  (Id.)  "Due to her chronic cocaine abuse, she would be unable to demonstrate the reliable attendance and adherence to a schedule needed to engage in sustained work at any exertional level."  (Id.)

The ALJ concluded that, absent the unreliability caused by the cocaine use and with the RFC caused by the accident, Plaintiff could not perform her past relevant work.  (Id. at 15.)  She was, however, a younger individual with a high school education and ability to communicate in English.  (Id.)  Although the application of the Medical-Vocational Guidelines would require a finding of "not disabled" considering her RFC, age, education, and work experience (unskilled), the additional limitations imposed by her substance abuse disorder so narrowed the range of work she could perform, a finding of "disabled" was required.  (Id. at 16.)

If Plaintiff stopped her substance abuse, her impairments would result in some of her alleged symptoms, but not all.  (Id. at 17.)  In concluding that Plaintiff was not entirely credible, the ALJ found that she could effectively ambulate within twelve months of the injury to her ankle; the second ankle surgery had restored "considerable functioning"; her knee pain

had been described as "well controlled" with her medication regimen; her testimony about gaining weight and abstaining from drugs was contradicted by the record; she failed to follow a prescribed course of treatment, including not bearing weight on her ankle when it was in a cast and losing weight; and she did not have any severe symptoms from her mental impairment when she was compliant with her medication and not using cocaine or alcohol. (Id. at 17-18.)

The ALJ next addressed Dr. Stromsdorfer's assessments of Plaintiff's ability to work. (Id. at 19.) He found Dr. Stromsdorfer's opinion that Plaintiff could not work 40 hours a week to be "grossly inconsistent with his own office notes." (Id.) His GAF listings ranged from 65 to 80 and were indicative of mild to minimal symptoms. (Id.) His explanation that the GAF listings were based on Plaintiff not working lacked support given that Plaintiff had not worked since May 2006. (Id.)

Additionally, the ALJ further found, Plaintiff's description of her daily activities on a function report indicated that she could perform sustained work activity. (Id.) And, she answered questions at the hearing in a clear and logical fashion and displayed no distress. (Id. at 20.) Favoring her credibility was her good prior work record. (Id.)

Consequently, the ALJ concluded, if Plaintiff stopped her substance abuse, there were a significant number of jobs in the national economy she could perform, as testified to by the VE and as evidenced by the Dictionary of Occupational Titles. (Id.) Plaintiff was not, therefore, disabled within the meaning of the Act. (Id. at 20-21.)

### Additional Medical Records Before the Appeals Council

The Appeals Council considered additional records from Dr. Stromsdorfer, summarized below.

On April 30, 2008, Dr. Stromsdorfer listed Plaintiff's appearance as unremarkable, her anxiety and depression levels as low, and her GAF as 65. (Id. at 739.) She was doing okay. (Id.) Her weight was 216 pounds. (Id.) On June 4, Plaintiff had a dysphoric appearance, delusions but no hallucinations, an anxious affect, a level of anxiety that was an eight and of depression that was a two, compromised concentration, and a GAF of 30. (Id. at 738.) She was to return in one week. (Id.) She did, and then had a dysphoric appearance, a depressed affect, a high level of anxiety and depression, intact concentration, and a GAF of 50. (Id. at 737.) The next month, on July 9, Plaintiff had a dysphoric appearance; delusions, but no hallucinations; a level of depression that was an eight and a level of anxiety that was a four to five; intact concentration; and a GAF of 55. (Id. at 736.) Her anxiety was better. (Id.)

## Legal Standards

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. § 1382c(a)(3)(A). The impairment suffered must be "of such severity that [the claimant] is not only unable to do [her] previous work, but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009); **Ramirez v. Barnhart**, 292 F.3d 576, 580 (8th Cir. 2002); **Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2002).  "Each step in the disability determination entails a separate analysis and legal standard."  **Lacroix v. Barnhart**, 465 F.3d 881, 888 (8th Cir. 2006).  First, the claimant cannot be presently engaged in "substantial gainful activity."  See 20 C.F.R. §§ 404.1520(b), 416.920(b).  Second, the claimant must have a severe impairment.  See 20 C.F.R. §§ 404.1520(c), 416.920(c).  The Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ."  Id. "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work."  **Caviness v. Massanari**, 250 F.3d 603, 605 (8th Cir. 2001).

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement.  See 20 C.F.R. §§ 404.1520(d), 416.920(d), and Part 404, Subpart P, Appendix 1.  If the claimant meets these requirements, she is presumed to be disabled and is entitled to benefits.  **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite her limitations."  **Moore**, 572 F.3d at 523 (citing 20 C.F.R.

§ 404.1545(a)(1)). "[RFC] is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (internal quotations omitted). Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of [her] limitations.'" **Moore**, 572 F.3d at 523 (quoting Lacroix, 465 F.3d at 887). "The need for medical evidence, however, does not require the [Commissioner] to produce additional evidence not already within the record. '[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.'" **Howard v. Massanari**, 255 F.3d 577, 581 (8th Cir. 2001) (quoting Frankl v. Shalala, 47 F.3d 935, 937-38 (8th Cir. 1995)) (alterations in original).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007); **Pearsall**, 274 F.3d at 1217. This evaluation requires that the ALJ consider "(1) a claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; and (5) functional restrictions." **Wagner**, 499 F.3d at 851 (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)). "The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." **Id.** (quoting Pearsall, 274 F.3d at 1218). After considering the Polaski factors, the

ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. §§ 404.1520(e), 416.920(e).

The burden at step four remains with the claimant to prove her RFC and establish that she cannot return to her past relevant work. **Moore**, 572 F.3d at 523; accord **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. §§ 404.1520(f), 416.920(f). The Commissioner may meet his burden by eliciting testimony by a VE, **Pearsall**, 274 F.3d at 1219, or "[i]f [a claimant's] impairments are exertional (affecting the ability to perform physical labor), the Commissioner may carry this burden by referring to the medical-vocational guidelines or 'grids,' which are fact-based generalizations about the availability of jobs for people of varying ages, educational backgrounds, and previous work experience, with differing degrees of exertional impairment," **Holley v. Massanari**, 253 F.3d 1088, 1093 (8th Cir. 2001). "However, when a claimant is limited by a nonexertional

impairment, such as pain or mental incapacity, the Commissioner may not rely on the Guidelines and must instead present testimony from a vocational expert to support a determination of no disability." **Id.**; accord **Baker v. Barnhart**, 457 F.3d 882, 894-95 (8th Cir. 2006). See also **Ellis v. Barnhart**, 392 F.3d 988, 996 (8th Cir. 2005) (noting that the Guidelines may be employed if the nonexertional impairment does not diminish or significantly limit the claimant's RFC); Social Security Ruling 83-47C, 1983 W.L. 31276, *3 (S.S.A. 1983) ("[I]f the nonexertional limitation restricts a claimant's performance of a full range of work at the appropriate [RFC] level, nonexertional limitations must be taken into account and a nonguideline determination made.").

As noted, the Commissioner may meet his burden at step five by eliciting testimony by a VE in response to "a properly phrased hypothetical question that captures the concrete consequences of a claimant's deficiencies." **Porch v. Chater**, 115 F.3d 567, 572 (8th Cir. 1997). "A hypothetical question is properly formulated if it sets forth impairments 'supported by substantial evidence in the record and accepted as true by the ALJ.'" **Guilliams v. Barnhart**, 393 F.3d 798, 804 (8th Cir. 2005) (quoting Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001)). Accord **Goff v. Barnhart**, 421 F.3d 785, 794 (8th Cir. 2005); **Haggard v. Apfel**, 175 F.3d 591, 595 (8th Cir. 1999). Any alleged impairments properly rejected by an ALJ as untrue or unsubstantiated need not be included in a hypothetical question. **Johnson v. Apfel**, 240 F.3d 1145, 1148 (8th Cir. 2001). Cf. **Swope v. Barnhart**, 436 F.3d 1023, 1025 (8th Cir. 2006) (remanding for further proceedings case in which ALJ did not include undisputed, severe impairment in hypothetical question to VE).

If the claimant is prevented by her impairment from doing any other work, the ALJ will find the claimant to be disabled.

An ALJ may not, however, award a claimant benefits if her "alcohol or drug abuse is a 'contributing factor material to the Commissioner's determination' of a disability." **Vester v. Barnhart**, 416 F.3d 886, 888 (8th Cir. 2005) (quoting 42 U.S.C. § 423(d)(2)(C)). "In the determination whether the substance abuse is 'material,' the claimant has the burden of demonstrating that she would still be disabled if she were to stop using drugs or alcohol." **Id.**

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)); accord **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001). "'Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion.'" **Wiese**, 552 F.3d at 730 (quoting Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004)). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision. **Id.**; **Finch**, 547 F.3d at 935; **Warburton v. Apfel**, 188 F.3d 1047, 1050 (8th Cir. 1999). The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730. Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's

findings, the [Court] must affirm the agency's decision." **Wheeler v. Apfel**, 224 F.3d 891, 894-95 (8th Cir. 2000). See also **Owen v. Astrue**, 551 F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

### Discussion

Plaintiff argues that the ALJ improperly failed to consider (a) Listings 1.02, 1.03, and 1.06 and (b) the opinions of Dr. Stromsdorfer.

The Listings. Listing 1.02, for major dysfunctions of one or more joints; Listing 1.03, for reconstructive surgery or a surgical arthrodesis of a major weight-bearing joint; and Listing 1.06, for a fracture of the femur, tibia, pelvis, or one or more of the tarsal bones, each require, in relevant part,[29] an "inability to ambulate effectively." 20 C.F.R. Pt. 404, Subpt. P, Appx. 1, §§ 1.02, 1.03, and 1.06. An "[i]nability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." Id. § 1.00 (2)(b)(1). An ability to ambulate effectively" requires that an "individual[] must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living." Id. § 1.00 (2)(b)(2). The individual

---

[29]Listing 1.02 may also be satisfied if the dysfunction results in an "inability to perform fine and gross movements effectively." 20 C.F.R. Pt. 404, Subpt. P, Appx. 1, § 1.02(B). This inability is not at issue in the instant case.

"must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail." Id. Moreover, "[t]he ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation." Id. Plaintiff argues that substantial evidence establishes her inability to ambulate effectively. It does not.

Plaintiff injured her left ankle and had reparative surgery in November 2005. A few weeks later, she was walking – against her surgeon's advice – on the ankle. Medical records of follow-up visits establish a pattern of Plaintiff ignoring instructions to not bear any weight on her ankle and having to have the cast replaced. Plaintiff correctly notes that she was placed in a fiberglass cast at one point and given a wheelchair at another time. Each was in response to Plaintiff continuing to bear weight on her ankle and thereby interfering with its recovery. Indeed, her steadfast refusal to adhere to her doctors' instructions caused three screws in her ankle to fracture. Even so, after two surgeries and repeated casts, Plaintiff's ankle was restored to a "considerable" level of functioning. No physician placed any permanent restriction on her walking or ambulation. In February 2008, Plaintiff was described as having a normal gait; the next month, as having no significant gait deviation; and the month after as

having a relatively normal gait. These observations were made by doctors treating her for her knee or ankle pain. The many form records of visits to Dr. Stromsdorfer consistently describe Plaintiff's gait as steady; none refer to her use of any assistive device. See **Schultz v. Astrue**, 479 F.3d 979, 982 (8th Cir. 2007) (rejecting claimant's argument that she was unable to ambulate effectively, as required by Listings; his doctors never imposed any limitation on his ability to walk and he testified he could walk without use of a cane). Plaintiff once referred to using a walker for two years; however, the records are devoid of any such use being recommended or otherwise recorded. As also noted by Plaintiff, she at one time was prescribed a custom-made brace. That was before her arthrodesis surgery and when she had not been wearing the boot prescribed by Dr. Grebing. When wearing the boot, she reported that her pain was less. More than one year later, Dr. Klein prescribed an-over-the counter brace when Plaintiff was favoring her right knee and placing more weight on her left ankle. Although advised by her doctors to lose weight to alleviate the problems with her knee and ankle, Plaintiff never did.

The medical records do include references to Plaintiff's complaints of pain in her left ankle. Those complaints stop after the arthrodesis surgery and after Plaintiff signed a contract not to seek narcotic medications from more than one doctor.

Thus, although there are references in the records that might support Plaintiff's claim of being unable to ambulate effectively, there is also substantial evidence on the record as a whole to support the ALJ's conclusion that she did not satisfy the Listings requiring such an inability.

Dr. Stromsdorfer's Assessment. Plaintiff next argues that the ALJ erred by failing to properly consider the report of her treating psychiatrist, Dr. Stromsdorfer, that she was unable to perform substantial gainful activity.

"'Although a treating physician's opinion is generally entitled to substantial weight, such opinion does not automatically control, since the record must be evaluated as a whole.'" **Wilson v. Apfel**, 172 F.3d 539, 542 (8th Cir. 1999) (quoting Cruze v. Chater, 85 F.3d 1320, 1324-25 (8th Cir. 1996)). Additionally, a treating physician's opinion must be supported by medically acceptable clinical or diagnostic data. **Chamberlain v. Shalala**, 47 F.3d 1489, 1494 (8th Cir. 1995). "The [social security] regulations provide that a treating physician's opinion . . . will be granted 'controlling weight' provided the opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record.'" **Holmstrom v. Massanari**, 270 F.3d 715, 720 (8th Cir. 2001) (quoting Prosch v. Apfel, 201 F.3d 1010, 1012-13 (8th Cir. 2000)) (alteration in original); accord **Wilson v. Apfel**, 172 F.3d 539, 542 (8th Cir. 1999). Accordingly, "[t]he weight given a treating physician's opinion is limited if the opinion consists only of conclusory statements." **Chamberlain**, 47 F.3d at 1494. See also **Brown v. Chater**, 87 F.3d 963, 964 (8th Cir. 1996) (permitting ALJ to discount health care provider's statement as to claimant's limitations because such conclusion apparently rested solely on claimant's complaints); **Piepgras v. Chater**, 76 F.3d 233, 235 (8th Cir. 1996) ("A treating physician's opinion deserves no greater respect than any other physician's opinion when the treating physician's opinion consists of nothing more than vague, conclusory statements.").

At the majority of her many visits to Dr. Stromsdorfer, Plaintiff was observed to have an unremarkable appearance, a logical flow of thought, intact concentration and orientation, a steady gait, and a calm affect. The only assessments that were not generally consistent were those in her GAF and levels of anxiety and depression. Her GAFs were either 60, 65, 70, 75, or 80. The majority, 16, were 65. Ten were 60, although five of those were in the summer of 2006 and she did not have another GAF of 60 for a year following that. Plaintiff's level of anxiety and depression did not necessarily correlate to her GAF. For instance, Dr. Stromsdorfer once assessed her GAF as 65 and her level of anxiety and depression as low. Another time, with the same level, she was assessed as having a GAF of 70. A GAF of 70 was once assessed when she had no anxiety or depression. Another time, Plaintiff was instructed to continue "as is" with a GAF of 70. She once had an anxiety and depression level of six but a GAF of 80. Another time, she had an anxiety and depression level of four but a GAF of 65.

In short, although Dr. Stromsdorfer had a treating physician's longitudinal picture of a patient, his summaries of her visits do not support his later conclusions that she was unable to perform substantial gainful activity. As recently observed by the Eighth Circuit Court of Appeals,

> [w]hile entitled to special weight, a treating physician's opinion does not automatically control, particularly if the treating physician evidence is itself inconsistent. Moreover, a treating physician's opinion that a claimant is "disabled" or "unable to work," does not carry "any special significance," 20 C.F.R. § 416.927(e)(1), (3), because it invades the province of the Commissioner to make the ultimate determination of disability.

**Davidson v. Astrue**, 578 F.3d 838, 842 (8th Cir. 2009) (interim case quotation omitted).  The ALJ did not fatally err in not giving those conclusions determinative weight.

### Conclusion

Considering all the evidence in the record, including that which detracts from the ALJ's conclusions, the Court finds that there is substantial evidence to support the ALJ's decision. "As long as substantial evidence in the record supports the Commissioner's decision, [this Court] may not reverse it [if] substantial evidence exists in the record that would have supported a contrary outcome or [if this Court] would have decided the case differently." **Krogmeier v. Barnhart**, 294 F.3d 1019, 1022 (8th Cir. 2002) (internal quotations omitted) accord **Gowell v. Apfel**, 242 F.3d 793, 796 (8th Cir. 2001).  Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is AFFIRMED and that this case is DISMISSED.

An appropriate Judgment shall accompany this Memorandum and Order.



/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  25th  day of March, 2010.